ORDER GRANTING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND DENYING DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT
 I. INTRODUCTION
This matter is before the court on the motion of Plaintiff (department) for summary judgment and the cross-motion of Defendant (taxpayer) for summary judgment. The parties have submitted a Stipulation of Facts and have stipulated to numerous exhibits. In the Magistrate Division taxpayer obtained a decision in its favor as to whether certain payments by taxpayer were business or nonbusiness deductions. The department raises additional issues in this appeal.
 II. FACTS
The years at issue are the 2001 and 2002 tax years of taxpayer. In those years the tax liability of taxpayer in Oregon is affected by net operating loss carryover amounts that depend upon the treatment afforded certain payments made in the tax years 1996 and 1997.
The payments in question arose as follows. Certain members of the family controlling taxpayer sought to achieve greater liquidity in respect of their ownership interest in taxpayer *Page 2 
(these persons are referred to as the Share Case Plaintiffs). Certain other members of the family and other unrelated individuals were directors of taxpayer and resisted the efforts of the Share Case Plaintiffs (these persons are referred to as the Director Defendants).
Beginning in 1988 the Director Defendants engaged in a number of transactions and actions designed to frustrate the goals of the Share Case Plaintiffs. In addition to classic anti-takeover moves, the Director Defendants also acted to issue a controlling stock interest to themselves and to cause a sale of certain stock of taxpayer to a newly formed employee stock ownership plan (the ESOP). In that transaction in 1988 the ESOP paid the amount of $6.80 per share for the stock it purchased.[1]
Viewing the actions of the Defendant Directors as wrongful, the Share Case Plaintiffs filed suit in Arizona (the Share Case) against the Director Defendants and taxpayer, alleging breach of fiduciary duty, wrongful exclusion from the board of directors of taxpayer, breach of contract and breach of the covenant of good faith and fair dealing. The record indicates, and taxpayer acknowledged at the hearing on this matter, that the Share Case Plaintiffs did not make other claims unrelated to their ownership interest in taxpayer. By the time the case went to trial, taxpayer was no longer a defendant in the case.
The Share Case Plaintiffs alleged that the actions of the Director Defendants had impaired the value of their stock in taxpayer so as to render it essentially worthless. The Director Defendants argued, and the trial court agreed, that this position required the Share Case Plaintiffs to relinquish their stock to the Director Defendants if they wished to receive a money damages award. Accordingly, after evidence was in but before the case went to the jury, the Share Case Plaintiffs elected to surrender their stock and receive damages. (Stip Ex 3 at 20.) *Page 3 
The jury in the Share Case proceeding returned a verdict finding that the value of the stock of the Share Case Plaintiffs had been reduced from its value in 1988 by an aggregate amount of $1.48 billion as a result of the actions of the Director Defendants. (Stip Ex E.) The verdict of the jury required the Director Defendants to pay that amount to the Share Case Plaintiffs. The liability was joint and several. The jury also reached a verdict that one of the directors, Edward J. Schoen (Schoen), was liable for punitive damages in the amount of $70 million.
The Share Case trial court entertained and granted a motion of the Director Defendants and Schoen for remittitur of the damage awards. (Stip Ex F.) As to the award for diminution in value of stock, the opinion of the trial court examined the evidence from the trial with respect to the value of the shares of the Share Case Plaintiffs in 1988. The court concluded that the evidence the jury had apparently relied upon, opinion testimony of the founder of the company, was not reliable when compared to a valuation, as of 1988, done by an investment bank. The court concluded that the diminution in value of the stock interest of the Share Case Plaintiffs was $461,838,000, with the value of the stock at the time of the judgment on remittitur being zero after giving effect to the wrongful acts of the Director Defendants. The court also reduced the amount of the punitive damages award to $7 million. The Share Case Plaintiffs accepted the reduced damage amounts in lieu of having to retry the case on the issue of damages.
In the face of the damage award against them, the Director Defendants filed appeals from the judgment and filed individual bankruptcy petitions. In the bankruptcy court proceedings the obligations of the Director Defendants under the Share Case judgment were claims. The rights of the Director Defendants to receive the stock of the Share Case Plaintiffs upon payment of the judgment were assets. *Page 4 
The Director Defendants also made demands on taxpayer to be held harmless in respect of the Share Case judgment. These claims were made pursuant to indemnification provisions in taxpayer's bylaws and indemnification agreements between taxpayer and the Director Defendants. These demands caused great concern to taxpayer because, if the demands of the Director Defendants matured, the resulting contingent liability would cause defaults under critical debt agreements that limited liabilities of taxpayer. (Stip Ex G at 4-5.)
An independent committee of taxpayer's board of directors, consisting of directors who were not defendants in the Share Case, considered the situation and authorized participation of taxpayer in a settlement agreement (the Settlement Agreement) calling for the payment of the judgment amounts in exchange for a release by the Defendant Directors of any claims against the company, assignment to taxpayer of the right to receive from the Share Case Plaintiffs the stock owned by them in taxpayer and certain other matters. (Stip Ex J.) Separately from that right to acquire the stock, taxpayer had certain first-refusal rights. Those rights would have entitled taxpayer to purchase the stock being transferred by the Share Case Plaintiffs in connection with the court judgment for an amount equal to the damage award. (Stip Ex 49 at 16.)[2]
Under the plans ultimately approved in the bankruptcy proceedings of the Director Defendants, completion of the Settlement Agreement was authorized. Taxpayer was to fund the payment of the state court judgment (the Share Case judgment) and was to receive the stock owned by the Share Case Plaintiffs. (Stip Ex 12.) *Page 5 
The transaction described above was completed. Taxpayer acquired the stock owned by the Share Case Plaintiffs.[3] Taxpayer recorded the transaction, for financial accounting purposes, as an acquisition of treasury stock in the total amount of payments made by the company.[4] At the same time, in filings made under federal securities law, taxpayer described the payments as having been for stock to the extent of $6.80 per share, with the remaining payment being described as "damages funded." (Stip Ex 28 at 54.)
Although taxpayer sought, in its securities law filings, to suggest that a purchase of stock had occurred only to the extent of $6.80 per share, the same filings contain statements clearly indicating that the payments made to the Share Case Plaintiffs pursuant to the Share Case judgment did not exceed the value of the shares acquired by taxpayer. (Stip Ex 27 at 21.) The relationship of payment amount and stock value was critical in that it permitted taxpayer to account for the transaction, for financial purposes, as a treasury stock transaction and to avoid charging any portion of the payment to current earnings.
On its federal and Oregon corporate tax returns, taxpayer took no deduction for the amounts it had described as being for the acquisition of stock — $6.80 per share — but did deduct the remainder of its payment, an amount it described as "damages funded." Those deductions created large net operating losses that taxpayer carried forward into the years at issue in this case. *Page 6 
 III. ISSUE
The issues presented are: (1) what amount did taxpayer pay for shares of its own stock surrendered by the Share Case Plaintiffs; and (2) if some amount was paid for indemnification of the Director Defendants, is any associated deduction properly deductible in the determination of apportionable business income of taxpayer?
 IV. ANALYSIS
A. What was paid for the stock? Logical Analysis
Under federal tax law as applied in Oregon, payments made by a corporate taxpayer to acquire its stock are not deductible. IRC § 162(k); ORS 317.010(10). The parties agree that when a payment is made and something in addition to stock is received by the corporate purchaser, the task is to determine what amount was paid for each element of the transaction. The stock acquisition element would not support a deduction but other elements might. Thus, for example, if a corporation both redeemed stock and made a settlement payment to discharge an obligation to pay accrued compensation to a shareholder employee, the amount paid for the stock would not be deductible but the amount paid for compensation would be deductible.
Taxpayers have asserted that the appropriate methodology for use in this case, which the court believes may be expressed as a formula, is:
 P - PS = PO, where
 P is the total price paid,
 PS is the amount paid for the stock, and
 PO is the price, if any, paid for other elements.[5] *Page 7 
Taxpayer says P is $461,800,000. Taxpayer says PS is $6.80 per share for a total of approximately $124,000,000 and PO, characterized by taxpayer as deductible indemnification payments, is approximately $337,800,000.[6]
The department appears to accept this formula, but argues that PS, the price paid for the stock, is the full amount paid by taxpayer in connection with the Share Case litigation.
Although valuation of property is normally a question of fact precluding summary judgment, the parties expressed their view at the hearing on this matter that something in the nature of an ultimate fact regarding value is possible on the basis of the stipulated record they have made in this case as to historic facts.
The court notes that, algebra being what it is, the formula set forth above, P - PS = PO, can be restated to:
 PS = P - PO
by subtracting the value PO from each side of the equation, adding the value PS to each side of the equation and inverting the resulting equation.
The court believes this residual approach is by far the better analytical approach because two out of three elements of the equation can be fixed by examination of definitive facts about the elements in the transaction. P, the amount of money paid out by taxpayer in connection with the transaction at issue, is known and not disputed. If PO can be definitively determined, PS can be established as the residual price remaining in the equation. For the reasons that follow, the court concludes that PO can be definitively and logically determined.
In this matter there was, legally and factually, a transaction between the Share Case Plaintiffs and the Director Defendants. There was a separate transaction between the Director *Page 8 
Defendants and taxpayer. These were compressed in time, occurring simultaneously by reason of the fact that under the Share Case judgment the right to receive the stock could be assigned by the Director Defendants and they assigned that right in exchange for taxpayer's undertaking to pay the amounts due under the Share Case judgment. However, two independent sets of legal rights and obligations were involved and settled. Taxpayer was not a party to the litigation between the Director Defendants and the Share Case Plaintiffs when it went to the jury or thereafter. No judgment was entered by the Share Case court against taxpayer. Further, the Share Case Plaintiffs were strangers to the indemnification rights and obligations of the Director Defendants and taxpayer and the negotiation and settlement of those rights and obligations.
The court considers the two condensed steps in the transaction separately and looks first at the resolution of rights and obligations of the Director Defendants and the Share Case Plaintiffs. In that transaction, PO must have been zero. This is because the only claims of the Share Case Plaintiffs related directly or indirectly to the stock in taxpayer and the effect of the actions of the Director Defendants on the value of the stock. A review of Stipulated Exhibit B, the complaint upon which the matter was tried, reveals those plaintiffs made no other claim for damages to their persons or other property. The only claims for damages related to and inhered in their stock ownership. Reflecting of this reality, the Share Case judgment dealt with only two items, payment of money to, and transfer of the shares by, the Share Case Plaintiffs — nothing more.
The transaction between the Defendant Directors and the Share Case Plaintiffs was resolved pursuant to the Share Case judgment, the Settlement Agreement, and the plan approved by the federal bankruptcy court. Neither the Settlement Agreement nor the bankruptcy plan purported to alter the elements of the Share Case judgment. They addressed only funding and *Page 9 
payment of the judgment, assignment of rights to the stock and certain other matters.[7] Taken together, the Share Case judgment and the federal bankruptcy plan called for a transaction with two, and only two, elements: the payment of cash by or on behalf of the Director Defendants and the surrender by the Share Case Plaintiffs of their ownership interest in taxpayer to the Director Defendants or their designee. (See Stip Exs F, 12.) The Settlement Agreement, to which the Share Case Plaintiffs were not parties, could not and did not purport to alter those elements. The attorneys for the parties understood that.[8]
It follows that the satisfaction of the Share Case judgment conclusively established that, as between the Director Defendants and the Share Case Plaintiffs, the value of PO was zero. There was simply no other element in the litigation to which value or consideration could be assigned. It further follows that at that point in the transaction what was to be paid for the stock can be calculated as follows:[9]
 PS = P - PO; and given that
 P = $461,800,000, and
 PO = 0,
 PS = $461,800,000
This cash payment required by the Share Case judgment was recoupment of the diminution in value of the stock held by the Share Case Plaintiffs caused by the actions of the Director Defendants. By reason of the rulings of the Arizona court, it was at the same time the *Page 10 
price of the stock for a transaction in which the Share Case Plaintiffs would transfer the stock. That transfer would also effect a transfer of any rights inherent in the stock, including the right to recover the judgment amount. The Share Case Plaintiffs had no right to recover any payment unrelated to their ownership interest in the stock. This is shown by the fact that the only condition, but a critically necessary condition, to the receipt of payment was the surrender of the stock. No other act or undertaking or release was required.[10]
The payment of the judgment amount and the surrender of the stock in taxpayer was the equivalent of a negotiated event occurring between parties acting at arm's length and with adequate information about the operations and economics of taxpayer.
The Defendant Directors were not forced to engage in the transaction. They had an appeal pending regarding the judgment of the trial court, an appeal that might reduce or eliminate the amount of the Share Case judgment. Dismissal of the appeal was required by the Settlement Agreement, but only when the bankruptcy plan transfers occurred — that is, upon transfer of stock to taxpayer.
The Share Case Plaintiffs were not required to transact at the price set in the judgment after remittitur. They, or any of them, could settle separately. Indeed, at least one of them did.[11]
Further, the Share Case Plaintiffs could have declined to accept the remitted amount of the damage award in favor of a retrial. Importantly, any retrial would only have been as to the *Page 11 
damages element of the underlying case. (See Stip Ex 3 at 19.)
There was an implicit valuation of the stock in the settlement of matters between the Share Case Plaintiffs and the Director Defendants. Nothing occurred between that event and the settlement of matters between the Director Defendants and taxpayer that could affect or change PS. Indeed, the transactions were contemporaneous in time although resolving separate sets of rights and obligations being settled. Accordingly, PS remained at $461,800,000 at the time of the settlement of matters as between taxpayer and the Director Defendants. Pursuant to the formula:
 P - PS = PO,
it follows that the implicit value of PO is zero because:
 $461,800,000 - $461,800,000 = 0
If taxpayer had made a payment to the Director Defendants in excess of $461,800,000, that amount would have to be viewed as evidence that something else was being paid for by taxpayer. Such a payment might or might not support a deduction against business income, depending on what that something else was. However, apart from the amounts, such as interest, to be considered separately in this case, no such extra payment was made by taxpayer.
In its 1996 annual report taxpayer described its payments made to Share Case Plaintiffs L.S. Schoen and his controlled corporation as well as Thermar, Inc. in the total amounts of $21.1 million and $41.8 million respectively. Those amounts are identical to the amounts awarded to such persons in the Share Case judgment. Taxpayer also disclosed its purchase of stock from Mary Anna Schoen-Eaton and her controlled corporation, achieved at a discount from the amount stated in the Share Case judgment. Of those payments, taxpayer told its shareholders and regulators: *Page 12 
 "Furthermore in the event the fair value of the consideration paid by the Company to the plaintiffs is in excess of the fair value of the stock repurchased by the Company, the Company will be required to record an expense equal to that difference. No such expense was recorded for book purposes related to the Maran/Schoen-Eaton, L.S.S. and Thermar transactions. No such provision has been made in the Company's financial statements for any payments to be made to the plaintiffs in the future."
(Stip Ex 27 at 21.) (Emphasis added.) The foregoing constitutes, in the opinion of this court, an admission by taxpayer that the amounts paid to Share Case Plaintiffs that were equal to the Share Case judgment amounts were not in excess of the then fair market value of shares acquired. Had there been any excess, adverse financial accounting, and presumably stock market results would have occurred for taxpayer. The court cannot conclude that what taxpayer told the securities markets and its own shareholders was false.[12]
The necessary conclusion is that, subject to separate consideration of other amounts, such as interest, the payment by taxpayer of $461,800,000, or $25.30 per share, was made for its stock, stock it received in the transaction. No portion of that payment was deductible in determining Oregon taxable income.[13]
B. Supporting Factors
This resolution of the matter comports with other facts in the case. First, as recognized by taxpayer itself, "the judge [in the state court litigation] determined that the value of the plaintiffs' stock in 1988 was $25.30 per share." (Stip Ex 26 at 3.) (Form 8-K filed by taxpayer with SEC.) The necessary conclusion from this is that, but for the actions of the Director Defendants, the stock would have been worth at least $25.30 per share in 1996. It must be *Page 13 
remembered that the question is what taxpayer paid for when it made the payments in 1996 and 1997. The department's position recognizes that the final payment reflected a diminution in value from a level that the Arizona court found to have existed at the point the Director Defendants began their wrongful conduct — conduct that damaged the value of stock in taxpayer. Thus, while the department, like the judge in Arizona, looks backwards in time, they do so only for determining what was payable for stock in 1996 and 1997. (See Stip Ex 1 at 29.)
Taxpayer also looks to 1988 but focuses on a transaction that occurred in the 1988 timeframe to set the upper limit on the amount of damage that could be done to the stock interest of the Share Case Plaintiffs. (See Ptf's Mot for Summ J at 25.) That transaction was a sale of some stock in taxpayer to an ESOP formed as part of the wrongful course of conduct of the Director Defendants. That transaction was between parties that do not appear to have been operating at arm's length. Most importantly, the ESOP had no interest in complaining about the price set for the sale of taxpayer stock to it. Unlike the Share Case Plaintiffs, the ESOP had no reason to negotiate for a higher value for the stock it was acquiring. In light of the finding of the Share Case judge as to value in 1988, the ESOP was participating in a very significant bargain purchase. Finally, using the price or "value" based on the ESOP transaction would not reflect adverse effect on value of the actions of Director Defendants who engineered the ESOP sale.
Second, although taxpayer has asserted that the value of the claims by the Director Defendants against it were significant in amount ($337,800,000), it does not appear from this record that taxpayer ever reflected any contingent liability for potential indemnification payments to be resolved through the payment made by the company to or on behalf of the Director Defendants. Rather, the financial accounting for the transaction was completely as an *Page 14 
acquisition of treasury stock.[14] As mentioned above, that accounting treatment was consistent with the reality facing taxpayer — if it had significant indemnification liability, it would be cast into default under major loan agreements and would have joined the Director Defendants under the umbrella of the federal bankruptcy code.
Apart from the effect of real damage exposure on its banking relationships, taxpayer also had to, and did, discuss the consequences of the payments it made with its remaining shareholders. In that instance, as shown in Stipulated Exhibit 27, taxpayer concluded, without qualification, that payments to certain Share Case Plaintiffs in exactly the amounts required by the Share Case judgment were not "in excess of the fair market value of the stock repurchased." (Stip Ex 27 at 21.) Taxpayer also told its other shareholders that the right to acquire the stock of the Share Case Plaintiffs for the full Share Case judgment amounts was a "corporate opportunity." (Stip Ex 27 at 92.) A right to buy shares for their value, or some lesser amount, could be described as an opportunity. An obligation or right to purchase at a premium to value could not be so described.
C. Taxpayer's Unilateral Characterization
Taxpayer essentially asks the court to honor its unilateral determination of the price paid for stock and the nature of its other payments as "damages." In some cases, amount, allocation or character of payments is the product of negotiation, characterization and binding agreement by the parties. Where there is "tax adversity," that is, where, for tax purposes, an agreed characterization or valuation helps one side of the transaction but hurts the other side, the characterization is often respected by the taxing authorities. Boris Bittker Lawrence Lokken, 1 Federal Taxation of Income, Estates andGifts, § 4.4.4 (3d ed 1999). In this case, all elements *Page 15 
that would support taxpayer's proposed amount and characterization are missing. First, there was no amount or characterization agreed upon between the Share Case Plaintiffs and the Director Defendants. The judgment was a product of litigation. The only elements of the judgment were payment of money and surrender of stock. There was no award of other damages.
Second, it is not apparent to the court that taxpayer's characterization had any "adversity" in it. Indeed, there are documents in the record suggesting that the "damages" label might benefit both taxpayer and the Share Case Plaintiffs.[15]
Finally, no one took or was required to take any tax position consistent with that taken by another party. (Stip Ex 12 at 56, § 22.6.) The "damages" characterization and the $6.80 per share value conclusion was thus effectively a unilateral characterization by taxpayer and is neither binding on the court or even persuasive. Neither the Share Case judgment nor the bankruptcy plan contains any language on characterization of the payments of cash made to satisfy the judgment. There is nothing in the record in the nature of an agreement by the Share Case Plaintiffs and taxpayer, or anyone else, as to the characterization of the payments.
D. Actions of Internal Revenue Appeals Officer
The issue presented in this appeal was also the subject of a decision of an Appeals Officer of the Internal Revenue Service, the findings and conclusions of whom are found in Stipulated Exhibit 16. All parties agree that neither the department nor this court is bound by those findings as to the price paid by taxpayer for the stock it acquired. While such analysis and findings could be persuasive, this court finds the analysis of the Appeals Officer to be wholly without merit on the fundamental question. *Page 16 
The Appeals Officer starts with the correct question, the value of the stock at the time the taxpayer purchased it.[16] The Appeals Officer made several fundamental errors thereafter.
First, he reversed the burden of proof, at one point stating that a $6.80 value for the stock (the same value contended for here by the taxpayer) should stand if "there is no convincing evidence indicating that the $6.80 per share [is] an arbitrarily low value unrepresentative of economic substance * * *." (Stip Ex 16 at 18.)
This court does not believe that the burden was on the government in that proceeding and it certainly is not here.[17]
Second, the Appeals Officer ignored or improperly discounted evidence showing that the $6.80 value was unreasonably low. The Appeals Officer never addressed the significance of the fact that the Director Defendants agreed to pay much more in a transaction in which the only element was the acquisition of stock. Nor did the Appeals Officer consider that both the Defendant Directors and the Share Case Plaintiffs were not compelled to proceed with the stock transfer at the amount set by the Arizona court on remittitur. The Appeals Officer thus completely ignored the most relevant transaction evidence, choosing instead to engage in a standard analysis of valuation of minority interests in stock where no transaction evidence is available.[18] *Page 17 
Ignoring the actual transaction between the Director Defendants and the Share Case Plaintiffs was coupled with a complete failure of the Appeals Officer to consider what the damage award of the Arizona court meant. The whole gravamen of the complaint of the Share Case Plaintiffs was that various actions of the Director Defendants had robbed their stock of value and the damage award was designed to restore that value. The Appeals Officer, however, concluded that the $6.80 price that was connected to the wrongful sale of stock to the ESOP was to be respected, even though that sale was one of the acts that had the effect of negatively impacting the value of the stock. The Appeals Officer also took a minority interest discount in his valuation exercise, ignoring the fact that the sale to the ESOP and other acts of the Director Defendants found to be wrongful had been undertaken to reduce the shares to minority status. Yet the Appeals Officer assigned no portion of the damage award to a recovery of that very value. The same can be said of the marketability discount taken by the Appeals Officer. Remember that the wrongful actions of the Director Defendants were taken to frustrate the efforts of the Share Case Plaintiffs to achieve liquidity — a synonym for marketability. Again, the Appeals Officer took into account the negative impact of the sin but gave no compensating adjustment for the damage award that was designed to compensate for the sin.
The case law on which the Appeals Officer relied does not bolster his conclusions. The Appeals Officer placed great reliance onOld Town Corporation v. Commissioner, 37 TC 845 (1962),acq 1962-2 CB 5. The problem is that Old Town does not involve the problem presented to the agent or this court. OldTown involved only an indemnification payment and the question was whether the taxpayer there really had an obligation or a likely obligation to make the payment. Id. at 845-46. The case did not involve allocation of a payment as between indemnification and some other aspect such as the acquisition of stock. *Page 18 
The Appeals Officer also relied on Lewis Taylor,Inc. v. Commissioner, 447 F2d 1074, 71-2 US Tax Cas (CCH) ¶ 9616 (9th Cir 1971) as to proof matters. That case did involve an issue of valuation of stock. There the similarity with this case ends. In Lewis Taylor the taxpayer put in evidence supporting its valuation and the IRS put no evidence into the record. Id. at 1077. Relying on a rule regarding uncontradicted evidence, the appellate court found for the taxpayer. Id. In this case there is substantial evidence supporting the conclusion the Director Defendants bought nothing from the Share Case Plaintiffs other than their stock so that all dollars paid were for the stock. That fact, the accounting treatment of the transaction by taxpayer, the absence of any charge to earnings by taxpayer for indemnification payments to directors, and the fact that the company made no cash payments to the Director Defendants directly all clearly support the conclusion that all dollars paid by taxpayer were paid for its stock.
The court cannot understand how or why the Appeals Officer concluded as he did. However, this court does not need to follow the murky path traced by the Appeals Officer.
 V. CONCLUSION
For the reasons stated above, the court concludes that the payments made by taxpayer as to the principal amount of the Share Case judgment are not deductible by reason of IRC section 162 (k). Now, therefore, *Page 19 
IT IS ORDERED that Plaintiff's motion as to principal amounts paid in respect of the Share Case judgment is granted and Defendant's cross-motion in that regard is denied.
IT IS FURTHER ORDERED that the case will be continued for consideration of proper treatment of payments of interest, fees and costs and punitive damages.
Dated this ___ day of October, 2010.
THIS DOCUMENT WAS SIGNED BY JUDGE HENRY C. BREITHAUPT ONOCTOBER 26, 2010, AND FILED THE SAME DAY. THIS IS A PUBLISHEDDOCUMENT.
[1] The price stated is after giving effect to a stock split of 400 to 1. (Stip Ex 91 at 3.)
[2] The filings made by taxpayer under the securities laws show taxpayer attempted to leave ambiguous the question of whether its acquisition of the shares of the Share Case Plaintiffs was or was not a product of its first refusal rights. It appears to the court that the reason for that studied ambiguity was an attempt to escape the logic applied in this order. It does not, however, matter whether taxpayer obtained its shares in that way or by reason of its rights pursuant to other arguments or legal rights. The bankruptcy plan of the Director Defendants states that the acquisition of stock by taxpayer was pursuant to the judgment, the rights of first refusal and its agreement to fund payments of the obligations of the Director Defendants. (Stip Ex 12 at 18.)
[3] Prior to completion of the bankruptcy plan, taxpayer made payments to two persons and their related holding companies in satisfaction of the obligations of the Director Defendants under the state court judgment. As to one such person, L.S. Schoen, the amount paid was equal to the amount awarded in the state court judgment. As to the other such person, Mary Anna Schoen-Eaton, the amount paid was approximately $20 million less than the amount awarded in the state court judgment. (Stip Ex 27 at 19-20.)
[4] In most cases, checks were actually issued separately to individuals who were plaintiffs and related personal holding companies that actually owned the stock of record. It should be noted that under Appendix 1 of the confirmed bankruptcy plan for the Director Defendants, in most cases, payments were bifurcated between an individual non-shareholder plaintiff and a corporate shareholder plaintiff. There was however in that appendix no characterization or statement as to what the consideration for the payments by taxpayer was. The plan itself called only for payment of cash and transfer of shares. (See Stip Ex 12.)
[5] Some might argue that what is needed is a value calculation; however, if, as discussed below, there is a transaction between parties acting at arm's length, price will equal value.
[6] The amount of $6.80 per share is the amount the ESOP paid in 1988 for acquisition of certain shares.
[7] Thus, for example, the plan did not purport to add receipt by the directors of a release or some other item, other than the stock, to which some portion of the payment to be made by the directors could be assigned.
[8] Stipulated Exhibit 98, a communication among attorneys in the case, describes the transaction as involving only payment and surrender of stock.
[9] The issues of interest on the Share Case judgment, punitive damages paid by taxpayer, and attorney fees and other cost reimbursements will be dealt with separately in further proceedings.
[10] Pursuant to the bankruptcy plan, by which the Share Case Plaintiffs were bound, the transfer of shares was compelled when payment was made. Failing such delivery taxpayer was authorized to return such shares to the status of treasury stock. Taxpayer has asserted that the stock is to be valued and should be valued as of some date earlier than the date that transfer and payment obligations occurred under the bankruptcy plan. As already discussed here, payment and value are synonymous as no element other than the stock was involved. Further, nothing in the law of taxation would justify looking to any date earlier than the date of actual transfer, if for no other reason than until the transfer occurred there was no binding obligation under the Settlement Agreement to dismiss the appeals the Director Defendants had taken.
[11] On September 19, 1995, taxpayer entered into a stock purchase agreement with Maran, Inc. (Maran) whereby taxpayer purchased 3,343,076 shares of common stock in taxpayer held by Maran. All of Maran's voting stock was held by Mary Anna Schoen-Eaton, one of the Share Case Plaintiffs. (Stip Ex 27 at 19-20.)
[12] This is not an instance where financial treatment and tax treatment can be different, as often occurs. Value is value. There is not one value of property for financial accounting and another for tax accounting.
[13] The department has argued that the Share Case judgment has preclusive effect in this court on the issue of the value or amount paid for the stock. The court does not disagree with that assertion but is of the opinion that the same result is obtained using the foregoing analysis.
[14] See Stip Ex 27 at 21, quoted above.
[15] The Director Defendants appear to have had no interest in the matter as they were indemnified by taxpayer as to adverse tax consequences. (Stip Ex J at 8.)
[16] This is the correct focus as to date. Taxpayer has looked at times to the value at the time of the jury verdict or in 1988 when the oppressive acts started. That focus ignores the fact that the important question is what the company paid for the stock when it bought it, not what value may have existed at some earlier date. The more general valuation question is only presented when a corporate taxpayer pays for more than one thing and there is no binding allocation as between stock and some deductible payment. Here there was a transaction between the Director Defendants and the Share Case Plaintiffs with a single element and no compulsion to complete the transaction. That transaction set the value of the stock at the time of purchase.
[17] The IRC section 162 (k) issue was not litigated in the Magistrate Division and the decision from which the department has appealed was only on the question of business or nonbusiness characterization of any deductible amount.
[18] The Appeals Officer also discounted without adequate explanation an actual transaction by another shareholder of taxpayer, completed at a price supporting the position of the IRS in the appeal.